IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KENARD WEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 17-0316-CG-B |
| | ) | |
| AM/NS CALVERT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's motion for summary judgment (Doc. 37), Plaintiff's opposition thereto (Doc. 46), and Defendant's reply (Doc. 47). For the reasons explained below, the Court finds that Plaintiff has not supported a *prima facie* case of racial discrimination and also has not shown that Defendant's legitimate, non-discriminatory, reason for terminating Plaintiff was pretextual. Accordingly, summary judgment will be granted in favor of Defendant.

## FACTS

The Plaintiff in this case is a black male who alleges he was discriminated against on the basis of his race by his employer, Defendant AM/NS Calvert. (Doc. 9). Defendant manufactures steel in the form of heavy coils that are then transported to one of the storage areas, ST1, ST2, ST3, or ST4, where they are evaluated for any defects before being transported out. (Doc. 40-1, ¶¶ 3, 9). Plaintiff was hired in

April 2011 as an Operator and was promoted to Packaging Coordinator in ST4 in 2013. (Doc. 41-2, ¶¶ 16, 17). Plaintiff understood from going through orientation when he was hired that Defendant had in effect an Equal Employment Opportunity Policy that prohibited discrimination. (Doc. 39-1, p. 13; Doc. 41-1, pp. 20-21).

Shipping and Packaging Coordinators in ST4 manage a crew of Team Members working under their supervision. (Doc. 40-1, ¶ 9). A Coordinator's primary responsibility is "vigilance of safety with Cranes and Team Members." (Doc. 40-1, ¶ 10; Doc. 40-2, p. 8). The Coordinator's responsibilities include ensuring safety of all Team Members, as well as evaluating the receiving coils for any defects that violate customers' coil specifications, packaging coils once that are confirmed in specification, and transporting the packaged coils to the required method of hauling. (Doc. 40-1, ¶ 9). A Coordinator is responsible for ensuring the crew is adhering to all Personal Protective Equipment ("PPE") requirements, including gloves, sleeves, eye protection and other required items. (Doc. 40-1, ¶ 11). A Coordinator is responsible for overseeing the crew's completion of all required computer-based trainings ("CBTs"), some of which pertain to safety awareness and PPE. (Doc. 40-1, ¶ 11). A Coordinator is to address and correct all safety concerns the moment they come up and is responsible for filling out "Yellow Near Miss cards if necessary." (Doc. 40-2, p. 8). Team Members are required to fill out Near Miss cards whenever they see a potential hazard - to help prevent future safety incidents and to create an awareness by all Team Members in safety-sensitive positions to be vigilant in noticing and resolving potential hazards. (Doc. 40-1, ¶ 12). The cards

require the Team Member to identify the hazard and also identify what steps the employee took to resolve the hazard. (Doc. 40-1, ¶ 13). Plaintiff testified that Coordinators were expected to complete two Near Miss cards per month and Operators were to complete Near Miss cards too. (Doc. 45-2, pp. 69-70).

In March 2015, Tim York became Team Manager of ST4. (Doc. 40-1, ¶ 2). As the Team Manager over ST4, York was familiar with Plaintiff's job performance and the job performance of other Packaging and Shipping Coordinators in that area. (Doc. 40-1, ¶ 8). York obtained the approval of Stephanie Davis, the Team Member Relations Specialist, prior to disciplining employees. (Doc. 40-1, ¶ 18). York reported to and worked closely with the Area Manager of ST4, Nick Kirkland. (Doc. 40-1, ¶ 8). York was not required to secure Kirkland's approval to discipline employees with letters of reprimand or suspensions but was required to obtain Kirkland's approval, as well as the approval of Stephanie Davis and the HR Director, Dale Laidlaw, before terminating an employee. (Doc. 40-1, ¶ 8; Doc. 41-1, ¶ 7; Doc. 41-3, p. 10).

On April 6, 2015, a Team Member on Plaintiff's crew, Damien Fountain, sustained a laceration due to failure to wear proper PPE – gloves. (Doc.39-1, pp. 71-72; Doc. 40-1, ¶ 20). York issued Plaintiff a letter of reprimand for the incident because he had often noticed Plaintiff's failure to reprimand his crew for failing to wear proper PPE and York had to continually remind Plaintiff to tell his crew to wear proper PPE. (Doc. 40-1, ¶ 21). Plaintiff admits that York had come to him on occasion and said that he had seen guys without their gloves on "or something to

that effect." (Doc. 39-1, pp. 72-73). However, Plaintiff does not feel it was fair to reprimand him because Plaintiff was in another building when the incident happened, they had just had their safety meeting for ST4, and Plaintiff had each of the Team Members sign a form saying they had been counseled that morning. (Doc. 39-1, pp. 71-74).

On June 22, 2015, York issued Plaintiff a second letter of reprimand. (Doc. 39-1, p. 75; Doc. 40-1, ¶ 23). The second letter of reprimand was because Plaintiff was delinquent in completing his computer-based training modules ("CBTs") – he was 53 days late completing one module and was similarly delinquent for seven other CBTs. (Doc. 40-1, ¶ 23). Plaintiff says he was overdue because the computer that was available for him to complete the CBTs was in a noisy area where he could not concentrate. (Doc. 39-1, p. 77). Plaintiff never asked if he could take the CBTs somewhere else because he did not think York would listen to him. (Doc. 39-1, p. 77). Plaintiff admits that it was reasonable that he was expected to complete his trainings. (Doc. 39-1, p. 78).

York had observed other problems with Plaintiff's job performance while York was Team Manager. York sent Plaintiff numerous emails asking Plaintiff about incomplete, inaccurate or missing reports, his failure to complete CBTs and other duties and his failure to properly maintain his work area or perform housekeeping duties on shift. (Doc. 39-1, pp. 45-55; Doc. 40-1, ¶ 27). According to York, Plaintiff's productivity as a Team Coordinator was substandard. (Doc. 40-1, ¶ 25). York created charts every month that compared the productivity of the four

shifts and for October and November 2015 Plaintiff's shift was outperformed by two

of the other three shifts, for December 2015 Plaintiff's shift was outperformed by all

three of the other shifts, and for January 2016, Plaintiff's shift was outperformed by

one of the other shifts. (Doc. 40-1, ¶ 25; Doc. 40-3, pp. 15-18). Plaintiff disagrees

with York's assessment of the production data. (Doc. 40-3, p. 6, ¶ 54).

On October 1, 2015, York emailed Plaintiff complaining that Plaintiff had

failed to put an issue reporting form on quarantined coils or log the quarantined

coils in the spreadsheet that morning, resulting in the quarantined coils not being

recorded in the computer system. (Doc. 39-1, pp. 78-79). Plaintiff asserts that the

issue reporting form could have gotten knocked off because they were double

stacking coils in the quarantine area and there were big fans that could have blown

it off. (Doc. 39-1, pp. 58-59, 81). According to York, it was Plaintiff's responsibility

to place issue reporting forms on the coils and to check the quarantine bay before

the end of shift to confirm that no coils were left without issue reporting forms for

the next shift. (Doc. 40-1, ¶ 30). York reports that he had experienced similar issues

with Plaintiff on September 28 and September 29. (Doc. 40-1, ¶ 30). Josh Abel, a

Coordinator who would relieve Plaintiff's shift, brought to York's attention multiple

times that Plaintiff had failed to properly label or move coils. (Doc. 40-1, ¶ 32; Doc.

41-4, ¶ 19). In the Oct. 1 email, York notified Plaintiff that he was going to draw up

a Performance Improvement Plan ("PIP") for Plaintiff. (Doc. 39-1, p. 79).

York decided to place Plaintiff on a Performance Improvement Plan ("PIP")

after consulting with Ms. Davis. (Doc. 41-2, ¶ 20). Davis drafted the PIP

memorandum which was signed by Plaintiff on October 15, 2015, with York's input. (Doc. 40-1, ¶ 34; Doc. 41-2. ¶ 22; Doc. 41-3, pp. 42-43, Doc. 39-3, pp. 19-20).   A memorandum addressed to Plaintiff and signed by Plaintiff on October 15, 2015 stated that the PIP is "a written set of expectations designed to assist you in understanding your performance expectations and how that relates to the overall success of the organization." (Doc. 39-3, p. 15).  The memorandum listed the following areas of performance expectations that Plaintiff needed "to focus on to ensure [his] success as a Shift Coordinator:"

- Create an environment where Team members know that standing around waiting is not acceptable. Also, encourage them to communicate with the cranes to stock their areas.
- Regardless of what is passed down, it is your responsibility once your shift starts to make sure all information is correct.
- Above all safety is first and foremost. Kenard needs to enforce this on his team. When a safety rule is broken, progressive discipline must be administered.
- This job requires multi tasking. Develop time management skills in order for tasks to be completed as expected.
- Kenard needs to manage all aspects of this Team. He needs to be more active in the overall state of the business during his shift. He needs to spend more time on the mill floor interacting and coaching other Team Members. (Manage By Walking Around) He is expected to keep a weekly report that documents this activity. Kenard needs to manage his Team's CBT's, as well as his own to ensure compliance.

 (Doc. 39-3, pp. 15-16).  The memorandum stated that Plaintiff's "[f]ailure to meet these performance expectations may result in termination." (Doc. 39-3, p. 16).  The PIP memorandum also stated that they "would meet formally every 4 weeks for 90 days to assess how you are progressing towards these goals." (Doc. 39-3, p. 16).

During the 30-day period after Plaintiff's PIP was implemented, York observed numerous performance issues by Plaintiff, including: Plaintiff's failure to submit any Near Miss cards, a serious quality failure on Plaintiff's shift, Plaintiff's failure to follow York's instruction to move a particular coil to quarantine during his shift, Plaintiff's failure to send York a requested status report, Plaintiff's failure to pack up a list of coils during his shift as directed, Plaintiff's Team Members' failure to properly communicate with the crane operator, Plaintiff's Team Members were observed standing around idly instead of attending to needed tasks and Plaintiff's failure to complete his CBTs as directed. (Doc. 40-1, ¶¶ 40-47). York and Davis met with Plaintiff for the 30-day review of his PIP on November 17, 2015. (Doc. 40-1, ¶ 39). York prepared a spreadsheet that listed the five areas the PIP stated he needed improvement in and also included a few additional specific performance issues to be addressed, including in relation to the third listed performance area involving safety, that Plaintiff "does not participate as often as he should in the Near Miss Program." (Doc. 39-3, pp. 18-20; Doc. 40-1, ¶ 39; (Doc. 41-2, ¶ 24). At the 30-day review York told Plaintiff that he had not seen any improvement in his performance in the areas identified in the PIP and in fact, his performance was worse in some of the areas. (Doc. 40-1, ¶ 39; Doc. 41-2, ¶ 24). Plaintiff reports that he "had a comment" for each of the performance issues York identified. (Doc. 45-3, p. 40-41). York asked Plaintiff how he could help Plaintiff improve, but Plaintiff denied any assistance. (Doc. 40-1, ¶ 39; Doc. 41-2, ¶ 24).

York and Davis met with Plaintiff for his 60-day review of the PIP on

December 17, 2015. (Doc. 40-1, ¶ 48). Prior to the meeting York reports that he had become quite frustrated with Plaintiff and his failure to improve. (Doc. 40-1, ¶ 48). Plaintiff had still not submitted a single Near Miss card. (Doc. 40-1, ¶ 48). York emailed Plaintiff numerous times between his 30-day review and his 60-day review regarding quality issues with coils Plaintiff was responsible for, Plaintiff's failure to follow instructions or complete tasks assigned, and his failure to accurately complete reports and other necessary logs. (Doc. 40-1, ¶¶ 49-54). Plaintiff had explanations for some of his failures, but York found the explanations to be unsatisfactory excuses. (Doc. 40-1, ¶¶ 52, 54). During the 60-day review, York told Plaintiff he had seen no improvement in the identified areas and specifically discussed Plaintiff's failure to submit any Near Miss Cards over the course of his PIP. (Doc. 40-1, ¶ 55). According to York and Davis, Plaintiff responded that he did not think the Near Miss Card program was worthwhile and that he had no interest or intention of participating in it. (Doc. 39-4, pp. 80-81; 40-1, ¶ 55; Doc.41-2, ¶ 25). Plaintiff testified at his deposition that he does not think the Near Miss cards were worthwhile because "a lot of time, the problem never gets fixed." (Doc. 39-1, pp. 98-99). After Plaintiff indicated he would not participate in the Near Miss Card program, York, with Davis' approval, decided to suspend Plaintiff and they informed Plaintiff that he was suspended pending further review. (Doc. 40-1, ¶¶ 55, 56; Doc. 41-2, ¶ 25). According to Davis, they knew when they did the 60-day review that it was not working out with Plaintiff and they had plans to terminate him before the meeting occurred. (Doc. 45-1, p. 26).

Following Plaintiff's suspension, York discussed the circumstances with the Area Manager, Nick Kirkland, and Kirkland decided that Plaintiff should be terminated for his failure to improve in the PIP and his insubordination and rejection of the Near Miss program. (Doc. 39-4, pp. 82-84; Doc. 41-1, ¶¶ 28, 29). On January 11, 2016, Davis and York called Plaintiff to tell him he was terminated. (Doc. 40-1, ¶ 62). No one was hired to replace Plaintiff, instead the shipping coordinator for that shift, Shannon Scruggs, who is white, took over Plaintiff's packaging duties as the company transitioned from using two coordinators (one for shipping and one for packaging) to using one Logistics Coordinator per shift. (Doc. 40-1, ¶ 63; Doc. 39-4, p. 77). In 2017, Elston Walker, who is African-American, was hired to replace Scruggs as the Coordinator on A shift for ST4. (Doc. 39-4, p. 79).

From 2015 to 2016, there were four Shipping Coordinators and four Packaging Coordinators in ST4 under Tim York's management, Josh Abell, Josh Goodell, John Johnston, Greg Kunkel, Jay Langley, Chad Larimore, Shannon Scruggs, and Plaintiff. These coordinators received discipline while under York's supervision but, according to York, none of the conduct of the other coordinators warranted termination or ever culminated to the level of conduct exhibited by Plaintiff. (Doc. 40-1, ¶ 64).

Johnston was reprimanded for being twenty days overdue on completion of his CBTs in August 2015 and because of continued performance and attendance problems was placed on a PIP in September 2015. (Doc. 40-1, ¶ 65). At Johnston's 30-day review, York and Davis noted improvements in Johnston's communication

with other Coordinators and improvement in his attendance. (Doc. 40-1, ¶ 67). At the 60-day review York noted that Johnston had continued to improve in those areas as well as in creating and fostering an environment of teamwork and empowering his team. (Doc. 40-1, ¶ 67). York noted Johnson had particularly improved his productivity in November and December 2015. (Doc. 40-1, ¶ 67). Johnston asked York to help him identify ways he could improve further. (Doc. 40-1, ¶ 67). By the 120-day review meeting, Johnston had improved in each of the identified performance issues and Davis and York agreed that he had successfully completed his PIP. (Doc. 40-1, ¶ 67). Johnston completed one Near Miss card in July 2015, one in September 2015, three in October 2015, and one in December 2015. (Doc. 45-4, pp. 44-47). Johnston received a letter of reprimand April 2016 for failure to complete housekeeping and other assigned tasks. (Doc. 40-1, ¶ 69). The letter of reprimand noted the previous PIP and included the following:

> You should consider this Letter of Reprimand a last and final warning. Any further violations of AM/NS policies, procedures or performance expectations will result in further corrective action up to an including termination of employment.

(Doc. 40-6, p. 23). Johnston voluntarily resigned in 2017 for medical reasons. (Doc. 40-1, ¶ 29). Plaintiff contends that Johnston "was a failure since day one" and was written up numerous times but he was not terminated. (Doc. 39-1, p. 129). Plaintiff does not know how many times Johnston was written up, what areas Johnston was asked to improve in, how far behind his CBTs were, or whether he showed any improvement. (Doc. 39-1, pp. 129-130).

On March 10, 2015, One of Chad Larrimore's team members received a

laceration due to his failure to wear required PPE and on March 27, 2015 Larrimore failed to wear proper PPE while banding a coil. (Doc. 40-1, ¶ 71). York issued Larrimore a Letter of Reprimand on April 2, 2105 for failure to promote safety. (Doc. 40-1, ¶ 71). York requested that Larrimore receive a one-day suspension, but Davis suggested he issue the Letter of Reprimand. (Doc. 40-1, ¶ 71). In September 2015, York issued Larrimore a Letter of Reprimand for failing to catch a serious quality issue. (Doc. 40-1, ¶ 71). In June 2016, Larrimore received a Letter of Reprimand and was demoted for failing to properly manage his Team Members on shift which caused overcapacity and delay in ST4. (Doc. 40-1, ¶ 71). Plaintiff asserts that Larrimore "walked off the job" and still was not terminated. (Doc. 39-1, p. 127). Plaintiff reports that Larrimore told Plaintiff he walked out because York got in Larrimore's face and dogged him in front of his peers and he walked out "to keep from hitting him." (Doc. 39-1, p. 128). According to York, Larrimore did not walk off the job. (Doc. 39-1, ¶ 72). York reports that during a discussion with Larrimore, Larrimore became upset, said he needed to take a minute to cool down, and left the discussion, which was continued later. (Doc. 39-1, ¶ 72). Plaintiff also contends that Larrimore "was the one that actually put the coil in the quarantine area the morning that [Plaintiff] was suspended" and that Plaintiff was blamed for. (Doc. 39-1, p. 132). However, Plaintiff admits that even if the coil was put in quarantine during Larrimore's shift, when Plaintiff came on shift and found the coil it was his responsibility to add it into the system. (Doc. 39-1, pp. 97-98).

Plaintiff reports he heard that Josh Goodell cursed York out, but he did not

work with Goodell a lot and had never talked to Goodell about that and was not sure how Goodell was treated. (Doc. 39-1, pp. 128, 131). York reports that Goodell never cursed at him. (Doc. 40-1, ¶ 75). Plaintiff also points out that Greg Kunkel turned over a forklift and was not terminated. (Doc. 39-1, pp. 127, 130). According to York, the forklift incident was not Mr. Kunkel's fault, but was caused by the weight of the object, not negligence or a violation of a safety rule. (Doc. 40-1, ¶ 74). Plaintiff testified that Josh Abell's numbers were not any better than Plaintiff's, but Plaintiff does not know how his CBT numbers were. (Doc. 39-1, p. 131). Plaintiff testified that he knows Jay Langley was written up on several occasions and was not terminated, but he does not know what he was written up for. (Doc 39-1, p. 133).

Shannon Scruggs was issued a letter of reprimand in November 2016, after Plaintiff's termination, for three instances of failing to properly scan Quality Summary Sheets in Sharepoint. Plaintiff says he did not have any problem working with Scruggs. (Doc. 39-1, p. 28).

Plaintiff testified that York would refer to Plaintiff as "you peoples" all the time. (Doc. 39-1, pp. 75-76). Plaintiff reports that when York talked to him he would say "You peoples, I don't understand you peoples." (Doc. 39-1, p. 76). Plaintiff testified that he asked York "What the hell is you people?" and York said he was not referring to Plaintiff as a black man, but "to you as the north and the south." (Doc. 39-1, p. 76). Plaintiff testified that he never heard York say that to anyone else. (Doc. 39-1, p. 76).

# DISCUSSION

## A. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment shall be granted: "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The trial court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "The mere existence of some evidence to support the non-moving party is not sufficient for denial of summary judgment; there must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" *Bailey v. Allgas, Inc.*, 284 F.3d 1237, 1243 (11th Cir. 2002) (quoting *Anderson*, 477 U.S. at 249). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, at 249-250. (internal citations omitted).

The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *See Anderson*, 477 U.S. at 251-252. The moving party bears the burden of proving that no genuine issue of material fact exists. *O'Ferrell v. United States*, 253 F.3d 1257, 1265 (11th Cir. 2001). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in its favor. *Burton v. City of Belle*

*Glade*, 178 F.3d 1175, 1187 (11th Cir. 1999). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citing *Mercantile Bank & Trust v. Fidelity & Deposit Co.*, 750 F.2d 838, 841 (11th Cir. 1985)).

Once the movant satisfies his initial burden under Rule 56(c), the non-moving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 524 (11th Cir. 1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Otherwise stated, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response .... must be by affidavits or as otherwise provided in this rule be set out specific facts showing a genuine issue for trial." *Vega v. Invsco Group, Ltd.*, 2011 WL 2533755, *2 (11th Cir. 2011). "A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). "[T]he nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). "Where the record taken as a whole could not lead a rational trier of fact

to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 at 587 (1986) (internal quotation and citation omitted).

## B. Plaintiff's Claims

Plaintiff claims he was discriminated against on the basis of his race when he was terminated by Defendant in violation of Title VII and 42 U.S.C. § 1981. (Doc. 9). "It is well established that '[c]laims of race discrimination under 42 U.S.C. § 1981 are analyzed in the same manner as claims brought under Title VII.' " *Bolton v. Baldwin Cty. Pub. Sch.*, 47 F. Supp. 3d 1342, 1349 (S.D. Ala. 2014), aff'd, 627 F. App'x 800 (11th Cir. 2015) (citations omitted). Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). A plaintiff may prove discrimination by relying on either direct, circumstantial, or statistical evidence. *See Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1555 (11th Cir. 1995). Direct evidence is evidence which, "if believed, proves the existence of discriminatory motive 'without inference or presumption'" *Hamilton v. Montgomery County Bd. of Educ.*, 122 F.Supp.2d 1273, 1279 (M.D. Ala. 2000) (quoting *Carter v. Three Springs Residential Treatment*,132 F.3d 635, 641 (11th Cir. 1998)). As the U.S. District Court for the Middle District of Alabama explained:

> Not only must it be evidence of discriminatory 'actions or statements of an employer' but the actions or statements at issue must 'correlate to

the discrimination or retaliation complained of by the employee.'
Further, the statements 'must be made by a person involved in the
challenged decision' and must not be subject to varying reasonable
interpretations.

*Id.* (quoting *Lane v. Ogden Entertainment, Inc.*, 13 F.Supp.2d 1261, 1274 (M.D. Ala.

1998)). No direct evidence of discrimination has been submitted to the Court. None

of the evidence offered proves without inference or presumption that the persons

who made the employment decisions did so based on Plaintiff's race. Plaintiff has

also not attempted to show discrimination through statistical evidence.

A plaintiff may attempt to show discrimination or retaliation based on

circumstantial evidence through the application of the *McDonnell Douglas* burden-

shifting analysis established by the Supreme Court. *McDonnell Douglas Corp. v.

Green*, 411 U.S. 792 (1973).[1] Under the *McDonnell Douglas* framework, a plaintiff

must first raise an inference of discrimination by establishing a *prima facie* case.

*See Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000) (citing *Combs v.

Plantation Patterns*, 106 F.3d 1519, 1527-28 (11th Cir.1997)).

Under the *McDonnell Douglas* framework, to prevail on a claim for

discrimination based on circumstantial evidence, a plaintiff may establish a *prima

facie* case of discrimination by showing:

---

[1] The McDonnell Douglas framework is not "the only way to use circumstantial evidence to
survive a motion for summary judgment." *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d
1249, 1255 (11th Cir. 2012). "If a plaintiff 'presents circumstantial evidence that creates a
triable issue concerning the employer's discriminatory intent,' [he] 'will always survive
summary judgment.'" *Id.* (quoting *Smith v. Lockheed–Martin*, 644 F.3d 1321, 1328 (11th
Cir. 2011)). "[I]f the circumstantial evidence is sufficient to raise 'a reasonable inference
that the employer discriminated against the plaintiff, summary judgment is improper.'" *Id.*
(quoting *Lockheed–Martin Corp.*, 644 F.3d at 1328).

(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class.

*Maynard v. Bd. of Regents of Div. of Universities of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003) (citations omitted).  There appears to be no dispute that Plaintiff is a member of a protected class and that he suffered an adverse employment action when he was terminated. However, Defendant contends that Plaintiff was not qualified for his position, he was not replaced by anyone initially and was ultimately replaced by a person of the same protected class and he was not treated less favorably than similarly situated individuals outside his protected class.

As to whether Plaintiff was qualified, Defendant asserts that Plaintiff was not qualified because he failed or refused to perform the requirements of his position. However, it has been held that "plaintiffs, who have been discharged from a previously held position, do not need to satisfy the *McDonnell Douglas* prong requiring proof of qualification." *Damon v. Fleming Supermarkets Of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) (citations and internal quotations omitted). Allegations that Plaintiff performed poorly do not show he was not qualified because "where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." *Id.* (citation and internal quotations omitted).  Defendant argues that the cases cited by Plaintiff to support such a presumption are age discrimination

cases under the ADEA, rather than Title VII race discrimination cases. (Doc. 47, p. 9). Defendant points to a Title VII case from this Court which listed the four prongs a plaintiff must show to make out a *prima facie* case and included the second prong requiring that the plaintiff show she "was qualified to do the job." *Johnson v. Mobile Infirmary Med. Ctr.*, 2015 WL 1538774, at *9 (S.D. Ala. Apr. 7, 2015). However, in *Johnson*, the defendant did not contend that the plaintiff was not qualified and this Court made no pronouncement about whether or not it could be inferred that the second prong was satisfied because the plaintiff had worked in the position for a period of time. The *Johnson* case merely listed the four standard prongs of a *prima facie* discrimination case just as the *Damon* case listed four prongs (including that the plaintiff was qualified to do the job) of a *prima facie* age discrimination case before it determined that it could be inferred from the plaintiff's long tenure at the position that she was qualified. *Damon*, 196 F.3d at 1359-1360. Defendant has cited no cases that have held that this inference or presumption should not apply to Title VII discrimination cases and has offered no other explanation why Title VII race discrimination cases should be treated differently in this regard than age discrimination cases under the ADEA. Allowing the inference does not really eliminated the second prong from the requirements of a *prima facie* case, but rather satisfies the prong by presumption.

Where the evidence demonstrates that an employee did not meet the objective requirements of the position, the employee's qualification may not be inferred from the fact that he held the position for an extended period of time. *See,*

*e.g., Dudley v. City of Bessemer, Ala.*, 2014 WL 4829532, at \*7 (N.D. Ala. Sept. 29, 2014) (plaintiff did not meet listed job qualification that she must be able to be certified as a Magistrate because her federal criminal conviction made her ineligible by law to be a Magistrate) (citing *Anderson v. Embarq/Sprint*, 379 Fed. Appx. 924, 929 (11th Cir.2010) (plaintiff could not establish he was qualified for his job where he could not perform the physical requirements of it, such as frequently lifting up to 70 pounds); *Samuels v. Univ. of S. Ala.*, 153 Fed. Appx. 612, 614 (11th Cir. 2005) (plaintiff did not establish she was qualified for position of Ultrasonographer II despite already holding the job where she lacked the requisite certification); *Santillana v. Florida State Court Sys.*, 2011 WL 722765, at \*16 (M.D. Fla. Feb. 23, 2011) aff'd, 450 Fed. Appx. 840 (11th Cir. 2012) (plaintiff failed to show she was qualified for position she held where she could not demonstrate that she met all the objective requirements in the job announcement); *Brady v. Santa Sweets, Inc.*, 2007 WL 1017670, at \*7 (M.D. Fla. Mar. 30, 2007) (plaintiff could not show he was qualified for job where defendant changed job requirements during plaintiff's tenure)).  In the instant case, Plaintiff's reported poor performance issues are subjective judgments regarding specific incidents that involve Plaintiff's attention to safety needs or how well he performed his duties. Plaintiff's reported outright refusal to participate in the Near Miss program might qualify as not meeting an objective requirement, but Plaintiff disputes that he completely refused to participate and reports that he merely expressed his opinion that he does not think the Near Miss cards were worthwhile. Although York was not happy with Plaintiff's

performance regarding the Near Miss cards, the stated requirements of Plaintiff's position only required that Plaintiff fill out Near Miss cards <u>when he saw a potential hazard</u>. Although there was evidence that Coordinators were expected to fill out two Near Miss cards per month there was no company rule that required a specific quota. Looking at the evidence in the light most favorable to Plaintiff, the Court finds that Defendant has not shown that Plaintiff did not meet an objective requirement of the job. The Court finds that, in this case, Plaintiff's continued employment in the position for more than two years is sufficient to support the second prong of a *prima facie* case.

Defendant contends that Plaintiff cannot satisfy the fourth prong because he was neither replaced by a person outside his protected class, nor treated less favorably than a similarly-situated individual outside his protected class. Evidence of either of these would support a *prima facie* case. *See Moore v. State of Ala.*, 989 F. Supp. 1412, 1418 (M.D. Ala. 1997), aff'd sub nom. *Moore v. Alabama*, 178 F.3d 1303 (11th Cir. 1999). Defendant contends that no one was hired to replace Plaintiff because the shipping coordinator for that shift, Shannon Scruggs, took over Plaintiff's packaging duties as the company transitioned from using two coordinators (one for shipping and one for packaging) to using one Logistics Coordinator per shift. (Doc. 40-1, ¶ 63). An African-American employee was later hired to take Scruggs place as Logistics Coordinator. (Doc. 39-4, p. 79). This Court has held that where a longtime employee of the company took over a plaintiff's duties, resulting in a decrease in the number of employees, then the position was

eliminated and the plaintiff was not "replaced." *Gortemoller v. Int'l Furniture Mktg.,*

*Inc.*, 2010 WL 11506989, at *4 (S.D. Ala. Nov. 29, 2010), aff'd, 434 F. App'x 861

(11th Cir. 2011). "Without some additional evidence that the position was not truly

eliminated (as in Phillips [*v. Aaron Rents, Inc.*, 262 Fed. Appx. 202 (11th Cir.

2008)][2] and Rollins [*v. TechSouth, Inc.*, 833 F.2d 1525 (11th Cir. 1987)][3]), Plaintiff's

theory that he was replaced cannot be sustained." *Id.* "Whenever a job is eliminated,

in connection with a reduction in force or otherwise, at least some [of] the duties of

the eliminated job will need to be undertaken by other employees." *Blackburn v.*

*Am. Tel. & Tel. Sys.*, 925 F. Supp. 762, 768 (N.D. Ga. 1995). "A person is not

replaced when another employee is assigned to perform the plaintiff's duties in

addition to other duties, or when the work is redistributed among other existing

employees already performing related work. A person is replaced only when another

---

[2] In *Phillips*, some of the plaintiff's duties were taken over by another employee but the store hired another employee after the plaintiff left and gave the new employee some of the plaintiff's duties. *Phillips*, 262 Fed. Appx. at 209.

[3] In *Rollins*:

> "The purported replacement, Richardson, was hired just two months prior to Rollins' termination. When Richardson was hired, Rollins was instructed to train Richardson to do her work. After Rollins was terminated, some of her former job duties were performed by Richardson. In the months immediately prior to Rollins' termination, changes in the defendant's customer contract eliminated Rollins' primary job responsibility. Rollins "contend[ed] that TechSouth, intending to fire her, restructured and relabeled her position, hired someone else to fill it, had her train that person, and then terminated her."

*Gortemoller*, 2010 WL 11506989, at *3 (quoting *Rollins*, 833 F.2d at 1529).

employee is hired or reassigned to perform the plaintiff's duties."[4] *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003) (citations and internal quotations omitted). Accordingly, the Court finds that Plaintiff has not shown that she was replaced.

Plaintiff can still support the fourth prong of a *prima facie* case by showing that he was treated less favorably than a similarly-situated individual outside his protected class. Plaintiff points to the fact that John Johnston was not terminated even though he was behind in his Near Miss program participation and was deficient in his Computer Based Training. However, unlike Plaintiff, Johnston completed some Near Miss cards during the time period in question – he completed one Near Miss card in July 2015, one in September 2015, three in October 2015, and one in December 2015. Johnston was reprimanded and placed on a PIP the month before Plaintiff was placed on a PIP. However, unlike Plaintiff, Johnston showed improvement at both his 30-day and 60-day review. Also, unlike Plaintiff, Johnston did not refuse help and was not believed to have completely refused to perform any duties. In fact, Johnston asked York to help him identify ways he could improve further. By the 120-day review meeting Johnston had improved in each of the identified performance issues and was adjudged by Davis and York to have successfully completed his PIP. A few months after Plaintiff's termination, in April

---

[4] The Court notes that not all Circuits agree. *See e.g. Griffin v. Sisters of Saint Francis, Inc.*, 489 F.3d 838, 845 (7th Cir. 2007) ("When an employee in a unique position is terminated and her position is not filled, but employees outside the protected class assume the fired employee's responsibilities, the employer has effectively replaced the employee.").

2016, Johnston was reprimanded again and given a written warning that any further violations would result in his termination. This uncontroverted evidence indicates that Johnston was treated the same as Plaintiff for similar conduct and that Defendant had legitimate reasons for treating Johnston differently by not terminating him. Johnston worked towards completing his duties and improving his performance and was successful in doing so, whereas Plaintiff was not.

After reviewing the evidence regarding Defendant's treatment of the other Coordinators under York's management, Josh Abell, Josh Goodell, Greg Kunkel, John Johnston, Jay Langley, Chad Larimore, and Shannon Scruggs, the Court finds that they were not treated preferentially. Most of the other Coordinators did not comply with the expectation that they submit two Near Miss cards per month, but none of the other Coordinators refused to participate at all or failed to submit any after being put on a PIP. The other Coordinators received discipline for certain incidents or poor performance, but their bad conduct did not culminate to the level of conduct exhibited by Plaintiff. Plaintiff has not shown that he was treated less favorably than the other coordinators. Looking at the evidence in the light most favorable to Plaintiff, as the non-movant, the Court finds that Plaintiff has not supported the fourth prong of a *prima facie* case.

Even if Plaintiff could support a *prima facie* case, the Court finds that Defendant has proffered a legitimate, non-discriminatory, reason for terminating Plaintiff and that Plaintiff has failed to show pretext. Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the Defendant, who must

"proffer a legitimate, non-discriminatory reason for the adverse employment action.

The employer's burden is exceedingly light." *Hamilton*, 122 F.Supp.2d at 1280

(quoting *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1021 (11th Cir. 1994)

(internal quotations omitted)). "Because the employer's burden is one of

production—not persuasion—the employer 'need not persuade the court that it was

actually motivated by the proffered reason[ ].' " *Kidd*, 731 F.3d at 1205 (quoting

*Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000)). If the Defendant

proffers a legitimate reason for the employment decisions, the burden then shifts

back to the plaintiff, who must show that the employer's proffered reasons are

pretextual, or merely a cover for discrimination. *Id.* "At the pretext stage, in order

to survive summary judgment, Plaintiff must provide sufficient evidence to allow a

reasonable fact finder to conclude, at a minimum, that the proffered reasons were

not actually the motivation for the employer's decision." *Miller v. Bed, Bath &*

*Beyond, Inc.*, 185 F.Supp.2d 1253, 1270 (N.D. Ala. 2002) (citing Combs, 106 F.3d at

1538). Plaintiff may do this "(1) by showing that the employer's legitimate

nondiscriminatory reasons should not be believed; or (2) by showing that, in light of

all of the evidence, a discriminatory reason more likely motivated the decision." *Id.*

(citations omitted). "This is done by pointing to 'such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered

legitimate reasons . . . that a reasonable factfinder could find them unworthy of

credence.' " *Hamilton*, 122 F. Supp.2d at 1281 (quoting *Combs,* 106 F.3d at 1539).

The ultimate burden of persuasion remains with the plaintiff at all times in cases

involving merely circumstantial evidence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

In satisfying the ultimate burden of proving that the adverse employment action was on account of race, a plaintiff need not establish that race was the sole reason for the action, but that it was a determinative factor in the employer's decision. *See Anderson v. Savage Laboratories, Inc.*, 675 F.2d 1221, 1224 (11th Cir. 1982) (citing *Haring v. CPC International, Inc.*, 664 F.2d 1234, 1239-40 (5th Cir. 1981)). However, it should be noted that federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions." *Chapman*, 229 F.3d at 1030 (quoting *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991)). It is not appropriate for either the plaintiff or this Court to "recast an employer's proffered non-discriminatory reasons or substitute his business judgment for that of the employer." *Chapman*, 229 F.3d at 1030. An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Communication*, 738 F.2d 1181, 1187 (11th Cir. 1984). An employer's reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. County Comm'n of Jefferson County*, 446 F.3d 1160, 1163 (11th Cir. 2006) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)). Courts "are not in the business of adjudging whether employment decisions are prudent or fair," but rather, their "sole concern is whether unlawful discriminatory animus

motivates a challenged employment decision." *Damon,* 196 F.3d at 1361.

In the instant case, Defendant terminated Plaintiff because, after Plaintiff had been reprimanded and had continuing problems with his job performance, he was put on a PIP which he failed to successfully complete, and he indicated he would not comply with the Near Miss program. Defendant has clearly met the "exceedingly light" burden of production on this issue. Thus, the burden then shifts back to Plaintiff to show that his employer's proffered reasons are pretextual, or merely a cover for discrimination.

Plaintiff contends that York made statements that show a racial animus. Plaintiff reports that York often told him "I don't understand you peoples." According to Plaintiff, he asked York why he referred to him that way and York responded that he was not referring to Plaintiff's race, but to "the north and the south." The meaning of the words "you peoples" in the context given is ambiguous. *See e.g. Randall v. Intercontinental Exch., Inc.*, 2005 WL 8154303, at *16 (N.D. Ga. June 2, 2005), report and recommendation adopted, 2005 WL 8154287 (N.D. Ga. July 14, 2005) ("to assume that Tullis meant to refer to plaintiff's race when he [said 'you people'] would constitute mere speculation."); *see also Umani v. Michigan Dep't of Corr.*, 432 F. App'x 453, 459 (6th Cir. 2011) (finding the "use of the term 'you people' does not qualify as a clear reference to race." "Without other allegations indicating a racist meaning, this ambiguous comment is not in and of itself racist."); *Alvarado v. Health Net, Inc.*, 21 F.3d 1111 (9th Cir. 1994) (finding statements like "I don't understand you people" are not necessarily racial). The fact that York

explained the meaning to be non-racial before Plaintiff filed any sort of complaint is evidence that the comments were in fact devoid of racial content. Even if the comments could have a racial meaning, ambiguous, isolated stray remarks alone will not establish pretext. *Ash v. Tyson Foods, Inc.*, 190 F. App'x 924, 926 (11th Cir. 2006) ("even if [the use of the word 'boy' could be] construed as racial, we conclude that the comments were ambiguous stray remarks not uttered in the context of the decisions at issue and are not sufficient circumstantial evidence of bias to provide a reasonable basis for a finding of racial discrimination"). Such statements do not show pretext when there is no indication that they are related to the employment decision. *Id.*; *see also Joseph v. New Jersey Transit Rail Operations Inc.*, 586 F. App'x 890, 892 (3d Cir. 2014) ("Some courts "have determined that the phrase 'you people' is too ambiguous to constitute direct evidence of discrimination when used in isolation, as it was here. Although we do not doubt that racial animus will sometimes lurk beneath the surface of this phrase, something more than speculation is needed to connect those dots. Here, [e]ven if we were persuaded that the use of the phrase 'you people' in this context would constitute direct evidence ... [Joseph] ha[s] not shown that [the decisionmaker ]relied on [Joseph's] race in deciding to terminate him." (citations and internal quotations omitted)); *Clay v. Interstate Nat. Corp.*, 124 F.3d 203 (7th Cir. 1997) ("Although Trandel's subsequent 'you people' remark is questionable, it was merely an isolated remark in a context independent of any adverse employment action and which, in light of the substantial evidence of Clay's inadequate performance, could not persuade a

rational factfinder to believe that Trandel had discriminated against him on the basis of race."). The Court finds the comments do not show that Plaintiff was discriminated on the basis of race.

Plaintiff also questions York's treatment of him because other Coordinators did not fill out the expected two Near Miss cards per month and had other performance issues but were not terminated. However, as previously discussed, a review of the evidence regarding the other Coordinators' conduct and treatment reveals that they were not treated preferentially. The other Coordinators were disciplined just as Plaintiff was, but their perceived failures and inadequate conduct did not rise to the level exhibited by Plaintiff. Plaintiff contends that York's assessment of his and the other Coordinators was wrong. But even if York was mistaken in his evaluation of the individual incidents Plaintiff was reprimanded for or was mistaken in his conclusions about Plaintiff's performance or the other Coordinators' performance, his mistake does not show pretext. As stated above, an "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix*, 738 F.2d at 1187 (emphasis added).

The fact that Davis and Kirkland relied on York's assessment of the circumstances also does not show pretext. Their reliance on York does not show racial bias, but merely that they valued his judgment because he interacted directly with Plaintiff and the other Coordinators more and was in a better position to judge their work. If York was shown to be biased, then their reliance on his judgment

would taint their decision to terminate Plaintiff.[5]  But the evidence has not shown that here.

Plaintiff also points to testimony indicating that Davis and York had already decided to terminate Plaintiff before they met with him for his 60-day review. After meeting with Plaintiff and discussing their issues with his work, they suspended Plaintiff. Plaintiff was not actually terminated until York discussed the situation with the Area Manager, Kirkland, and Kirkland agreed and approved the termination. Nothing in this scenario indicates racial bias. The fact that York and Davis thought Plaintiff should be terminated before they met with Plaintiff at his 60-day review does not show bias. The evidence indicates that York was very frustrated with Plaintiff's performance and lack of improvement during the 60 days. Whether their meeting with Plaintiff was to give him one last chance to explain himself and promise to do better or was just a formality before they suspended him and sought formal approval to terminate him, the timing of their decision does not show bias. Nor is bias shown by the fact that York then went to Kirkland to obtain the final decision from Kirkland. York was required to secure Kirkland's approval before terminating an employee. York was simply following company policy.

As explained above, the Court is not here to judge whether employment

---

[5] The "cat's paw" theory applies when a decisionmaker acts exclusively based on the recommendation of a biased party without independently investigating the complaint against the employee or evaluating the employee's situation. *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998). In such a case, causation is established because "the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.*

decisions are prudent or fair but whether the decisions were motivated by unlawful discriminatory animus. *Damon*, 196 F.3d at 1361. The Court finds there is not sufficient evidence for a reasonable fact finder to conclude that the proffered reasons were not actually the motivation for Defendant's decision. Plaintiff has not shown that Defendant's legitimate nondiscriminatory reasons should not be believed or that a discriminatory reason more likely motivated the decision.

## CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (Doc. 37) is **GRANTED** and Plaintiff's claims are **DISMISSED with prejudice**.

**DONE** and **ORDERED** this the 29th day of October, 2018.

/s/ Callie V. S. Granade
SENIOR UNITED STATES DISTRICT JUDGE